# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 18-1065V
UNPUBLISHED

| | |
|---|---|
| RAFAEL FRANCISCO OJEDA COLON,<br><br>              Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND HUMAN SERVICES,<br><br>              Respondent. | Chief Special Master Corcoran<br><br>Filed: June 3, 2021<br><br>Special Processing Unit (SPU); Findings of Fact; Statutory Six Month Requirement; Influenza (Flu) Vaccine; Guillain-Barré Syndrome (GBS) |

*Roberto E. Ruiz-Comas*, RC Legal & Litigation Services PSC, San Juan, PR, for Petitioner.

*Althea Walker Davis*, U.S. Department of Justice, Washington, DC, for Respondent.

## DECISION[1]

On July 20, 2018, Rafael Francisco Ojeda Colon filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges the Table claim that he developed Guillain-Barré syndrome ("GBS") as a result of receiving an influenza ("flu") vaccine on October 17,

---

[1] Because this Decision contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

2013. Petition at 1.[3] The case was assigned to the Special Processing Unit of the Office of Special Masters.

Respondent's Rule 4(c) Report, dated July 30, 2019 (ECF No. 46), disputed Petitioner's entitlement to a Vaccine Program award. Specifically, although Respondent conceded that Petitioner has satisfied the criteria for a Table GBS injury, the medical record did not preponderantly support the conclusion that Petitioner suffered the residual effects of GBS for more than six months. Rule 4(c) Report at 8-11 (citing 11(c)(1)(D)(i)).

I ordered the parties to brief this issue, and they have done so. Petitioner's Motion in Compliance with Order and Petitioner's Brief in Support of Severity, dated April 27, 2020 (ECF No. 55) ("Motion") and Petitioner's Motion for Findings of Facts and Conclusions of Law Regarding Severity Argument, dated July 6, 2020 (ECF No. 58); Respondent's Response to Petitioner's Motion in Compliance with Order and Brief in Support of Severity Argument, dated June 26, 2020 (ECF No. 57) ("Response") and Respondent's Response to Petitioner's Motion in Compliance with Order and Brief in Support of Severity Argument, dated July 20, 2020 (ECF No. 59).

For the reasons set forth below, I find that Petitioner has failed to satisfy the severity requirement. Accordingly, his claim is DISMISSED.

I. Issue

At issue is whether Petitioner has met the Vaccine Act's severity requirement by showing that he continued to suffer the residual effects or complications of GBS for more than six months.

II. Authority

Petitioners not asserting a vaccine-related death or other injury requiring a surgical intervention and inpatient care must demonstrate that they suffered the residual effects or complications from their vaccine-related injury for more than six months. Section

---

[3] Given the Vaccine Act's three-year limitations period, the claim should have been filed by no later than the fall of 2016 (three years from onset) – not July 2018 – and was thus facially untimely. Section 16(a)(2). Arguably, the Act's "lookback" provision (*see* Section 16(b)) saved the claim from untimeliness, because (a) the Petition was filed within two years of the Table's amendment in March 2017 to add flu-GBS as a Table claim, and (b) the alleged injury began within eight years of amendment. I have, however, ruled that only valid Table flu-GBS claims are saved by the lookback requirement. *See Randolph v. Sec'y of Health & Human Servs., No. 18-1231, 2020 WL 542735, at *8* (Fed. Cl. Spec. Mstr. January 2, 2020). Regardless, all Vaccine Act claims must satisfy severity, and I am dismissing this claim on that basis (although it does otherwise appear that the claim would be a viable Table claim but for severity).

11(c)(1)(D); *Cloer v. Sec'y of Health & Human Servs.*, 654 F.3d 1322, 1335 (Fed. Cir. 2011).

It is the Petitioner's burden to prove his case, including the six-month severity requirement, by a preponderance of the evidence. *Song v. Sec'y of Health & Human Servs.*, 31 Fed. Cl. 61, 65–66 (1994), *aff'd*, 41 F.3d 1520 (Fed. Cir. 1994). A petitioner cannot establish the length or ongoing nature of an injury solely through his or her own statements, but rather is required to "submit supporting documentation which reasonably demonstrates that the alleged injury or its sequelae lasted more than six months . . ." *Black v. Sec'y of Health & Human Servs.*, 33 Fed. Cl. 546, 550 (1995), *aff'd*, 93 F.3d (Fed. Cir. 1996).

While even mild symptoms that do not require intensive medical care may satisfy the severity requirement, ongoing medical treatment for conditions unrelated to the alleged vaccine injury do not. *Compare Wyatt v. Sec'y of Health & Human Servs.*, No. 14-706V, 2018 WL 7017751, at *22–23 (Fed. Cl. Spec. Mstr. Dec. 17, 2018) (petitioner's post-vaccination GBS resolved within three months; subsequent ongoing medical treatment for upper respiratory and gastrointestinal infections did not satisfy six-month requirement), *with Herren v. Sec'y of Health & Human Servs.*, No. 13-1000V, 2014 WL 3889070, at *3 (Fed. Cl. Spec. Mstr. July 18, 2014) (ongoing mild GBS symptoms that did not require active medical care nevertheless satisfied severity requirement).

### III. Findings of Fact

I make the following finding regarding severity after a complete review of the record to include all medical records, affidavits, Respondent's Rule 4 report, and briefing by the parties. Specifically, I base my findings on the following evidence:

- Petitioner was administered a flu vaccine on October 17, 2013. Ex. 2 at 1; Ex. 9 at 1, 3. He was 70 years old at the time of vaccination. Ex. 1.

- On or about October 23, 2013, Petitioner traveled from Puerto Rico to Colombia via aircraft. Petitioner avers that during the first leg of his trip, he began to experience left leg numbness. He states that "I started dragging my left foot and continued dragging it during the remainder of my [five] days of vacation." Ex. 7 at 1.

- Upon his return to Puerto Rico, on October 29, 2013, Petitioner presented to Dr. Edgardo Colon Zavala at Centro Neurodiagnostico ("Centro"). Ex. 4 at 5-8. The medical note reflects that Petitioner stated that he began to have trouble walking during his flight to Colombia. *Id.* at 5. Petitioner reported that his problems were greater on his left side and that he experienced mild numbness and tingling in his left foot. *Id.* Petitioner also noted a two-day history of diarrhea "after eating food in Columbia." *Id.* Dr. Zavala diagnosed Petitioner with acute

3

- infective polyneuritis and recommended further evaluation for possible vaccine-induced GBS. *Id.* at 7.

- Following his appointment at Centro, on October 29, 2013, Petitioner was admitted to Hospital Español Auxilio Mutuo ("Auxilio") for a chief complaint of bilateral foot drop with numbness. Ex. 5 at 2. Petitioner reported that his symptoms started five days earlier with difficulty walking and "tingling in soles." *Id.* at 4-5. He further stated that he had difficulty lifting his feet and "no diarrhea prior to symptoms, only [two] days after symptoms." *Id.* at 4. Petitioner was diagnosed with GBS and, on October 31, 2013, was prescribed a five-day course of Intravenous immunoglobulin ("IVIg") therapy "to prevent progression and avoid severe neuro[logical] damage/dysfunction." Ex. 5 at 8, 14, 271.

- A neurology note dated November 4, 2013, reflects that Petitioner was "seen and found [without] new def[icits]." Ex. 5 at 276; Ex. 11 at 13.[4] He was expected to complete IVIg therapy that day. *Id.*

- On November 5, 2013, it was noted that although Petitioner continued to have distal leg weakness, his condition had not deteriorated. Ex. 5 at 279. It was also noted that Petitioner had constipation and would be given "meds to stimulate." *Id.*

- Petitioner was discharged from Auxilio on November 6, 2013, with diagnoses of GBS, polyradiculopathy, and diabetes mellitus. Ex. 5 at 333.

- Petitioner presented to Dr. Priscilla Mieses Llavat on November 7, 2013. Ex. 12 at 5.[5] The medical note documenting this visit indicates that Petitioner suffered from a decreased active range of motion of his distal lower extremities, "left more than right." *Id.* The medical note further indicates that Petitioner experienced reduced strength in his left and right distal dorsilflexion and plantarflexion. *Id.* Moreover, Petitioner exhibited decreased sensation in his distal lower extremities. *Id.* He was assessed with GBS and left foot drop and was instructed to attend physical therapy. *Id.*

- On November 19, 2013, Petitioner presented to his primary care physician, Dr. Gabriel Hernandez Denton. Ex. 10 at 6.[6] In addition to noting Petitioner's previous GBS diagnosis, Dr. Denton indicated that Petitioner suffered from constipation and had experienced an episode of fecal impaction. *Id.*

---

[4] Records from Auxilio were originally filed as Exhibit 5. Because page 276 included notations in Spanish, a fully translated version of this record was filed within Exhibit 11.

[5] Dr. Llavat's records were originally filed as Exhibit 6. Because they were found to be illegible, the transcribed version of these records was filed as Exhibit 12.

[6] Dr. Denton's records were originally filed as Exhibit 3. Because certain pages within this exhibit were found to be illegible, the transcribed pages were filed within Exhibit 10.

- Petitioner presented to Dr. Llavat on November 22, 2013, December 24, 2013, January 27, 2014 and February 11, 2014. Ex. 12 at 6-9. By Petitioner's February 2014 appointment, Dr. Llavat noted that Petitioner's numbness had abated and that he was "doing better." *Id.* at 9. Petitioner was assessed with GBS and left foot drop, and Dr. Llavat recommended that he participate in a home exercise program. *Id.*

- Petitioner presented to Dr. Denton on April 24 and May 1, 2014. The records documenting these visits reflect that Petitioner experienced "changes in his [b]owel habits." Ex. 10 at 6.

- Petitioner underwent a screening colonoscopy on May 9, 2014. Ex. 13 at 2. Following this procedure, Petitioner was diagnosed with a colon polyp as well as internal and external hemorrhoids. *Id.*

- Dr. Denton again examined Petitioner on July 22, 2014. Ex. 10 at 5. The medical note documenting this appointment indicates that Petitioner was diagnosed with chikungunya.[7] *Id.*

- On September 2, 2014, Petitioner returned to Dr. Llavat with a complaint of bilateral hand pain "that started [seven] weeks ago with viral infection. No numbness." Ex. 12 at 10. Dr. Llavat noted "[t]enderness and stiffness of bilateral hands and right shoulder with decrease range of motion secondary to pain." *Id.* She further noted a mild decrease in the active range of motion of Petitioner's extremities. *Id.* Petitioner was assessed with bilateral hand and shoulder stiffness and "viral infection." *Id.* There was no mention of sequelae of GBS at this visit.

- Petitioner presented to Dr. Denton on October 20, 2014. Ex. 10 at 5. The medical note indicates that he was "S/P [status post]" GBS and chikungunya. *Id.* Dr. Denton's impression was type two diabetes. *Id.*

- Petitioner returned to Dr. Denton on December 16, 2014 for routine labs. Ex. 10 at 5. Although no specific findings were noted, a stool test was negative for blood. *Id.*

- Witness affidavits were submitted by Mr. Vincente E. Rios and Mr. Eugenio Perez Matos. Ex. 16 at 2-3. In them, Mr. Rios and Mr. Perez aver that they witnessed Petitioner's "left leg [give away] while walking" on December 30, 2014. *Id.*

- A medical note, dated January 12, 2015, indicates that Petitioner "fell in Spain and hurt [his] right wrist and right knee." Ex. 12 at 11. There is no mention of sequelae of GBS at this visit.

---

[7] According to the Centers of Disease Control and Prevention, chikungunya virus is spread to people by the bite of an infected mosquito. The most common symptoms of infection are fever and joint pain. *See* https://www.cdc.gov/chikungunya/index.html (last visited June 1, 2021).

- Petitioner had an at-home medical appointment with Dr. Denton on July 13, 2015. Ex. 10 at 3. The medical note from this date indicates that Petitioner suffered from multiple pelvic fractures due to a fall. *Id.*

- On August 5, 2015, Petitioner was examined by Dr. Llavat in his home. Ex. 12 at 12. The medical record reflects that he "fell from a horse on June 2015 and sustained fractures of bilateral acetabulum and bilateral superior and inferior pubic rami." *Id.* Petitioner was unable to walk and exhibited "tenderness in right hip area and pubic bones with decreased range of motion." *Id.* He was assessed with "right hip pain secondary to factures [and] muscle weakness." *Id.*

- Petitioner presented to Dr. Denton on December 18, 2017. Ex. 10 at 3. The medical note reveals that, in addition to suffering from type two diabetes, Petitioner also suffered from hypercholesterinemia. *Id.* There is no mention of any other issues.

- Dr. Llavat drafted a letting indicating that Petitioner received physical therapy six times in November 2013, twice in December 2013, and twice in June 2017. Ex. 14. There are no corresponding notes that detail Petitioner's condition at the time of these visits, the reason for his attendance, or the exercises that he performed on these dates.

- In his affidavit, Petitioner avers that he "spent almost a year recovering from a severe foot drop for which I initially had to use crutches and then later on move to ambulating with a cane." Ex. 7 at 1. He further states that he suffered from episodes of severe constipation "for about six months after the vaccination" and, as of July 2018, continued to suffer from poor balance and falls. *Id.*

- A witness affidavit was submitted by Ms. Ada Diez de Ojeda, Petitioner's wife. Ex. 16 at 1. In it, she notes that her husband suffered from constipation in November 2013 and that this was the first time she knew him to suffer from this condition. *Id.* She further noted that, as of March 10, 2020, "[Petitioner] has undergone several episodes of occasional constipation, the last one as recent as . . . February 29, 2020." *Id.*

- On October 1, 2019, almost six years after Petitioner was first diagnosed with GBS, he presented to Dr. Jose Carlos for his "opinion and recommendations regarding his sequelae of the GBS." Ex. 15 at 2. Dr. Carlos found that Petitioner's "cranial nerve examination was normal except for droop in the left nasolabial fold and mouth, which seems to date from GBS. He cannot whistle since his GBS." *Id.* at 2. Dr. Carlos further determined that Petitioner "[c]annot walk tandem" and that "sensation to cold, vibration, and pin was reduced in a stoking pattern below the calves, bilaterally, but more pronounced in the left distal leg." *Id.* at 3. Ultimately, Dr. Carlos concluded that the sequela of Petitioner's GBS included "distal leg weakness, facial weakness . . . and distal, asymmetrical, sensory deficit . . . in the legs." *Id.* at 3. Although an exercise

program was discussed, Dr. Carlos opined that Petitioner's deficits were "most probably" permanent "given the time since his GBS." *Id.*

Based upon a review of the entire record, I find that Petitioner has failed to establish that he suffered the residual effects of GBS for more than six months.

In this case, because Petitioner received the flu vaccine on October 17, 2013, and claims an onset in mid-to-late October 2013, he must demonstrate that his injuries continued through at least mid-to-late April 2014.[8] However, the medical records reflect that Petitioner was last assessed with GBS sequelae on February 11, 2014 – approximately four months from onset. Ex. 12 at 9. And there are no records thereafter that document specific treatment or care associated with the GBS that Petitioner unquestionably experienced in the fall of 2013.

To support his severity contention, Petitioner argues that the constipation he experienced in the months and years following his November 2013 GBS diagnosis should be considered. *See* Motion at 3. But the medical records relevant to these symptoms largely indicate only that he experienced changes in his "bowel habits,"[9] and was later diagnosed with a colon polyp and hemorrhoids in the spring of 2014 – not that these symptoms were thought to be GBS sequelae. Ex. 10 at 6; Ex. 13 at 2. Indeed, although Petitioner was constipated when he was hospitalized for GBS in early November 2013, and subsequently suffered from an episode of fecal impaction, it was not until April 24, 2014 – more than five months later – that his gastrointestinal issues were again even mentioned in the medical records, and no association was drawn with his prior GBS diagnosis. Ex. 5 at 279; Ex. 10 at 6. This gap is especially notable, because despite Petitioner's claim that he continued to suffer from severe constipation in the months following his GBS diagnosis, this condition was not mentioned in the medical notes documenting his appointments with Dr. Llavat (the physician primarily responsible for the management of Petitioner's care in the months following his GBS diagnosis). Further, there is no evidence that Petitioner's primary care physician made an association between Petitioner's gastrointestinal complaints and GBS.

---

[8] Some special masters have read Section 11(c)(1)(D) as requiring a Vaccine Program petitioner to experience his claimed injury or residual effects thereof later than six months after the date of *vaccination*, rather than the date of injury onset. *See, e.g., Uetz v. Sec'y of Health & Human Servs.*, No. 14-29V, 2014 WL 7139803, at *3 (Fed. Cl. Spec. Mstr. Nov. 21, 2014). Whether the six-month requirement runs from the date of vaccination or date of onset is not dispositive to my resolution of this matter, however, and my analysis would be the same whether I measure the six-month period from the date of vaccination or date of onset (although I deem the latter to be the more equitable start date for measuring severity).

[9] Petitioner acknowledges that neither he, his wife, nor his primary care physician "can be 100[%] certain that the 'change in bowel habits' notes meant constipation." Motion at 4. Whether this change refers to constipation or some other gastrointestinal issue is not dispositive to my resolution of this matter.

7

Petitioner's witness affidavits (from both himself as well as his wife) also attempt to corroborate severity beyond April 2014. Ex. 16 at 1 (stating that her husband's hospitalization "was the first time I saw him suffering from constipation" and that "he has undergone several episodes of constipation"); Ex. 7 at 1 (stating that "[f]or about six months after vaccination, I also suffered from episodes of severe constipation"). Although such evidence is entitled to consideration, and has some probative value, this kind of testimonial evidence has been deemed insufficient by itself to establish severity – especially when it is countered by contrary record evidence. *See, e.g., Uetz v. Sec'y of Health & Human Servs.*, No. 14-29V, 2014 WL 7139803, at *3-4 (Fed. Cl. Spec. Mst. Nov. 21, 2014)(finding affidavits contrary to the contemporaneous medical record did not establish a finding that the six-month requirement had been satisfied); *see also Vogler v. Sec'y of Health & Human Servs.*, No. 11-424V, 2014 WL 1991851, at *4, 8-10 (Fed. Cl. Spec. Mstr. Apr. 25, 2014)(recognizing that filed affidavits can "bulwark" a claim that an injury meets the six-month requirement, but not in the face of a medical record to the contrary).

Here, these witness averments have to be weighed against the medical record evidence. That record establishes (a) no specific GBS treatment after February 2014, (b) no mention of GBS sequelae thereafter either, but (c) ample evidence for the three to four-year period after substantiating treatment for many other conditions and illnesses, some of which might better explain Petitioner's GI distress. It is reasonable from review of all such evidence *in toto* to conclude that Petitioner would have sought treatment or intervention if he had continued to suffer sequelae for his GBS, and/or that his treaters would have mentioned it – and the fact that the records are silent on these matters has more evidentiary significance than Petitioner's after-the-fact assertions of ongoing symptoms. This is not a case where a claimant offers evidence to fill in holes or to provide detail missing from a record. Rather, the record itself tells the story that the subsequent witness statements seek to supplant.

Petitioner also argues that as a result of his GBS, he suffered a loss of balance caused by issues with his left foot "beyond the six-month threshold." Motion at 5. Petitioner claims that this led to falls, and that he "spent almost [one] year recovering from severe foot drop for which I initially had to use crutches and then later on move to ambulating with a cane." Ex. 7 at 1. However, the last mention of any issues with Petitioner's left foot drop is a medical record from February 11, 2014 – again, only around four months after onset. Ex. 12 at 9. There are no records indicating that Petitioner subsequently experienced difficulty walking until the summer of 2015 – and this occurred following his tumble from a horse. Exs. 10 at 3; 12 at 12. And although Petitioner was provided with the opportunity to secure other evidence documenting his use of ambulatory devices for the relevant timeframe, he failed to do so. *See* Order, ECF No. 48.

8

There is little doubt that Petitioner did fall at least once in late 2014 or early 2015. This is corroborated by three witness affidavits as well as a January 12, 2015 medical note reflecting that Petitioner "fell in Spain and hurt [his] right wrist and right knee." Ex. 12 at 11. *See also* Ex. 16 at 2-3. However, this medical note does not attribute Petitioner's fall to left foot drop, or to any other condition that may be related to GBS.

In a further attempt to fortify his argument that the statutory severity requirement has been met, Petitioner offers a letter from Dr. Jose Carlo, a neurologist who examined Petitioner approximately six years after his flu vaccination. Ex. 15. Although Dr. Carlo physically examined Petitioner and identified certain medical deficiencies, he failed to provide any corroboration (in the form of contemporaneous record evidence) for his statements about why these deficiencies should be attributed to Petitioner's previous GBS diagnosis.

For example, Dr. Carlo determined that Petitioner's cranial nerve examination was "normal except for droop in the left nasolabial fold and mouth, which seems to date from his GBS." Ex. 15 at 2. However, as noted by Respondent, "Dr. Carlo failed to cite any record documenting an abnormal cranial nerve examination during Petitioner's evaluation and treatment for GBS." Response at 3. Indeed, a review of Petitioner's contemporaneous medical records reveals that physicians determined that his cranial nerves were "intact." Ex. 5 at 271, 276;[10] Ex. 11 at 13.[11] Moreover, there is nothing in Petitioner's medical records that document any signs or complaints of facial weakness any time prior. Therefore, Dr. Carlo's attribution of Petitioner's facial droop to GBS lacks persuasive evidentiary support.

Dr. Carlo also opined that Petitioner had "distal leg weakness . . . and distal, asymmetrical, sensory deficit" in his legs that were sequela of GBS. Ex. 15 at 3. However, Dr. Carlo again failed to provide any corroboration for this claim. Despite acknowledging that Petitioner sustained pelvic fractures after falling from a horse in July 2015, he neither explores whether this intervening incident may have caused Petitioner's symptoms, nor does he offer an explanation of how his conclusion was reached. Expert opinions based on unsupported facts may be given relatively little weight. *See Dobrydnev v. Sec'y of Health & Human Servs.,* 556 F. Appx. 976, 992-93 (Fed. Cir. 2014) ("[a] doctor's conclusion is only as good as the facts upon which it is based") (citing *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,* 509 U.S. 209, 242 (1993) (finding that when an

---

[10] An October 30, 2013 neurology note also appears to indicate that Petitioner did not exhibit cranial nerve deficits, although the handwriting on this record is unclear. *See* Ex. 5 at 267.

[11] Records from Auxilio were originally filed as Exhibit 5. Because page 276 included notations in Spanish, a fully translated version of this record was filed within Exhibit 11.

9

expert assumes facts that are not supported by a preponderance of the evidence, a finder of fact may properly reject the expert's opinion)). *See also Gerami v. Sec'y of Health & Human Servs.*, No. 12-442V, 2013 WL 5998109, at *4 (Fed. Cl. Spec. Mstr. Oct. 11, 2013) *mot. for review denied*, 127 Fed. Cl. 299 (2014) (finding unpersuasive a letter from a treating physician containing conclusory statements about petitioner's symptoms lasting beyond six months when letter lacked citation to medical records).

I am aware that a variety of evidence can be used to satisfy issues like severity, and I am reluctant to dismiss a case simply on this basis, especially given the Program's emphasis on generosity in reaching entitlement decisions. *See Watts v. Sec'y of Health & Human Servs.*, No. 17-1494, 2019 WL 4741748, at *6 (Fed. Cl. Spec. Mstr. Aug. 13, 2019)(recognizing the generosity of the Vaccine Program and how this policy concern impacts interpretation of the Act's severity requirement). However, severity *is* a claim requirement, and cases may legitimately be dismissed if the record does not preponderantly reveal sufficient evidentiary support for this claim element. *See Prepejchal v. Sec'y of Health & Human Servs.*, No. 15-1302V, 2018 WL 5782865, at *15-16 (Fed. Cl. Spec. Mstr. Oct. 5, 2018) *mot. for review denied*, 141 Fed. Cl. 519 (2019) (finding petitioner's failure to satisfy the severity requirement as a basis for the claim's dismissal). Here, I have conducted a thorough record review in reaching my determination, and even giving Petitioner's witness statements some weight, I cannot find that severity is met.

## CONCLUSION

Based on the record as a whole, Petitioner has failed to prove by preponderant evidence that his GBS or its residual effects lasted for more than six months. Accordingly, Petitioner has not established entitlement to an award of damages, and I must DISMISS his claim.

**IT IS SO ORDERED.**

s/Brian H. Corcoran
Brian H. Corcoran
Chief Special Master